## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| STEPHEN P. FAHY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 98-JEO-2230-S |
| | ) | |
| BUSINESS VENTURES, INC. and | ) | |
| JAMES PERKINS, JR., | ) | |
| | ) | |
| Defendants. | ) | |

ENTERED

NOV 21 2000

## MEMORANDUM OPINION

This matter is before the court after a trial of the case before the undersigned and on the motion of defendants Business Ventures, Inc. ("BVI") and James Perkins, Jr. ("Perkins") for a judgment as a matter of law (doc. 45).[1] Upon consideration, the court finds that the plaintiff is entitled to a verdict in his favor and the defendants' motion is due to be denied.

## I. BACKGROUND

### A. Procedural History

Plaintiff Stephen P. Fahy ("Fahy") initially filed a complaint on September 1, 1998, asserting that BVI willfully failed to pay him overtime wages to which he was entitled under the Fair Labor Standards Act of 1938 ("FLSA"). 29 U.S.C. §§ 201, *et seq.* (Doc. 1). BVI filed an answer on October 7, 1998. (Doc. 5). It included a counterclaim against Fahy under the Alabama Litigation Accountability Act ("ALAA"). BVI also filed a motion to dismiss the complaint on October 9, 1998, (1) for failure to state a claim under FEDERAL RULE OF CIVIL

---

[1] References herein to "doc. ___" are to the document number assigned by the Clerk of the Court, located in the lower right hand corner of the pleading.

*50*

PROCEDURE 12(b)(6), (2) because Fahy did not authorize the filing of this action in writing as required by the FLSA, (3) for lack of jurisdiction under the FLSA because the FLSA does not apply to BVI due to the fact that it does not produce goods, and (4) because it is frivolous and in violation of the ALAA. (Doc. 6). Fahy filed a motion to dismiss the counterclaim because the ALAA has no applicability to actions in federal court. (Doc. 7). He also filed a response to BVI's motion to dismiss on October 19, 1998. (Doc. 10). Included with the response was an "Authorization and Consent" regarding the initiation of this lawsuit executed by the plaintiff. (*Id.*, Attachment). The motion to dismiss the complaint was denied and the counterclaim was dismissed on the concession of counsel for BVI that the ALAA did not apply to this matter. (Doc. 22, p. 5; doc. 23). Fahy filed a motion to amend the complaint on November 3, 1998, which was granted, and the amended complaint was filed on November 4, 1998. (Docs. 11 & 12). In the amended complaint, Fahy added Perkins as a defendant, alleging that Perkins was the President, Chief Operating Officer, and alter ego of BVI. (Doc. 13). Therefore, Fahy concludes that Perkins is jointly liable for the claims asserted against BVI. (*Id.*). The amended complaint was formally served on Perkins on or about July 14, 1999. (Doc. 31). He filed an answer on August 4, 1999. (Doc. 32).

The case was set for a pretrial conference on June 11, 1999. On June 15, 1999, defendants BVI and Perkins filed a motion for summary judgment pursuant to Rule 56 of the FEDERAL RULES OF CIVIL PROCEDURE. (Docs. 26 & 28). They asserted that the FLSA did not apply because (1) Fahy was an exempt employee and (2) BVI did not produce goods as they are defined by the FLSA. Perkins also filed a motion to dismiss this action, citing the grounds raised in BVI's motion for summary judgment and premised on a lack of proper service. (Doc. 27).

2

Perkins filed his answer after the plaintiff served him.  (Doc. 32).  The motions were denied by the court.  (Docs. 34 & 35).

A second pretrial conference was conducted on October 27, 1999, resulting in a pretrial order that was entered on the same date.  (Doc. 37).  The court conducted a non-jury trial commencing December 30, 1999.  (Doc. 46).  The defendants filed the instant motion for judgment as a matter of law on December 30, 1999.  (Doc. 45).  The parties were permitted to submit briefs on the motion.  The defendants argue (1) that certain of the plaintiff's claims are barred by the applicable statute of limitations; (2) the court is without jurisdiction because the plaintiff's written authorization to commence the action was filed subsequent to their motion to dismiss; (3) the FLSA does not apply because plaintiff's work, including "service contracts, record[s], reports and training" is not covered; (4) the plaintiff is exempt from coverage under the FLSA; and (5) Perkins is not individually liable.  (Doc. 47).  The plaintiff has filed a post-trial brief in opposition to the defendants' positions (doc. 48) and the defendants have filed a brief in rebuttal (doc. 49).

**B. Statement of Facts**

Fahy began work for BVI in April 1995. (TR 13).[2]  According to Perkins, the President and sole shareholder of BVI, the company provides contract "technology services and software, software related technology services, and program and project management services in technical areas," and other services. (TR 116-17).  Perkins began the business as a sole proprietorship in about 1980 and incorporated in 1982. (TR 116).  During the time period relevant to this suit, BVI

_____

[2] References herein to "TR ___" are to the transcript of the trial found at document 46.

had gross receipts in excess of $500,000. (TR 119-20).

Perkins interviewed Fahy and offered him a position with BVI. (TR 15, 120). Fahy's employment contract, which was signed in mid-February 1995 ((P-1)(D-3)),[3] lists Fahy's position as Project Manager and his rate of pay as "$48,000 annually for each hour actually worked [sic]." ((P-1),(D-3) (underlining in original)).[4] He was assigned to the computer division. (TR 16). At the time he was hired, BVI was involved in projects or bids with Protective Industrial Insurance Company, Cooper Green Hospital, BellSouth, and Alabama Power Company. (TR 20-23, 172). Fahy began work on a contract with Alabama Power on May 22, 1995, involving an ongoing project. (TR 20-22). Perkins was physically working in Birmingham when Fahy went to work at Alabama Power, (TR 38), and Perkins was actively involved in company projects. (TR 39).[5] After Fahy began working at Alabama Power, he did not have much contact with Perkins because the work he was doing was straightforward and did not require much interaction with anyone at the BVI office. (TR 39). Ultimately, the project was turned over to Fahy and it was his duty to document Alabama Power's budgeting system to develop a training manual to be used with the budgeting program. (TR 24, 135). He did his work at Alabama Power's facility in Birmingham. His work time was billed by BVI to Alabama Power at a rate starting at $37.50 and ending at $40.00. (TR 118). Fahy reported to the Alabama

---

[3] References herein to "P-___" and "D-___" are to the exhibits submitted by the plaintiff and the defendants in the trial of this matter.

[4] Defendants' exhibit number 9, a letter from Perkins to Fahy stating that Fahy's salary was to be increased on May 6, 1996, "from $48,000 to $50,880.00 annually," also demonstrates that Fahy worked as a salaried employee at least through April 19, 1996. (D-9).

[5] Fahy testified that Perkins was involved in the Cooper Green and Protective Industrial Insurance projects on projects Fahy was working. (TR 39).

4

Power management team and no other BVI employees worked on site with him.  (TR 26, 135-36).[6]  Fahy was given the choice to hire additional employees for the contract, but he chose to work the project himself. (TR 152).[7]

In August of 1995, Fahy was asked by personnel at Alabama Power to perform some duties that would require him to work extra hours. (TR 29).  Fahy was interested, so he spoke to his supervisor, Cristyl Collins,[8] about being compensated for the extra hours that he would work. (TR 27-29, 218-19).  Fahy told Collins that he "would gladly work the extra hours" if they (Collins and Perkins) were willing to change him to an hourly employee. (TR 29).  Ms. Collins responded that she would talk it over with Perkins and get back to Fahy. (TR 29, 219).  Perkins was the only one who could authorize a change in Fahy's pay status. (TR 133, 169, 204).  Perkins agreed to the extra compensation, (TR 89, 132), and Fahy's salary was converted into an hourly rate.[9] (TR 30, 87-88).[10]  Thereafter, Fahy was compensated at his hourly rate for every

---

[6] Fahy testified that other BVI employees worked at Alabama Power, but they were unconnected to the activities with which he was involved.

[7] He "maintained some management responsibilities for other projects" during his time at Alabama Power.  (TR 136, 140-44).  For a short while after he went to Alabama Power, Fahy also supervised another employee, Kevin Thomas, who was working at another site.  (TR 235, 248-49).

[8] Fahy reported directly to Cristyl Collins and Collins reported directly to Perkins. (TR 122).  Collins started with BVI in 1990.  In 1995, she was the director of business computer professionals division ("BCP") and later became vice-president of BVI.  (TR 215-16).

[9] On August 22, 1995, an interoffice memo was sent out by Cristyl Collins, the Director of the Business Computer Professionals division of BVI and Vice President of BVI. (P-6).  The relevant part of the memo stated:

Effective immediately.

All employees working on contract assignments are no longer classified as Full-time Salary employees.  The new classification is Full-time, Hourly.

The following addresses overtime hours worked for Full-time Hourly employees:

1. All Full-time Hourly employees will be paid his or her hourly rate for overtime hours worked. (To calculate hourly rate, divide current salary

hour worked.  (TR 31).[11]  When Fahy received a raise in annual salary, the raise was converted

into an hourly rate.  (TR 34, 36).[12]  He would submit a weekly time sheet to Collins and to the

Alabama Power project manager.  (TR 32).  Fahy never received, in any week, an amount less

than his agreed upon salary.[13]  (TR 37).  He never complained that he was not receiving overtime

pay.  (TR 227-28).  Fahy continued to work under BVI's contract at Alabama Power until August

1997, when he received a promotion.  (TR 20, 25).[14]  He filled the position that was vacated by

Collins and was given the title of vice-president.  (TR 25).  His replacement at Alabama Power

---

by 2080 hours.)

2. All overtime hours must be approved by contract manager and BVI
manager.

Benefits for Full-time Salary and Full-time Hourly employees are the same.

(P-5; D-4).  James Perkins was listed on the memo as receiving a copy of the same.  (P-5).  Perkins assumed that he received a copy of the memo, but states that it was written to deal with employees working at BellSouth.  (TR 133-34).  Collins testified that the memorandum did not apply to Fahy because he was working on the Alabama Power contract.  (TR 220, 225).  However, nothing in the memo limits its application to the BellSouth contract.

[10] According to Perkins, he confirmed this change for his accountant.  (TR 133).

[11] By way of example, on August 31, 1995, Fahy sent Perkins's assistant, Shirley Feagan, a memo requesting compensation for 11 hours of overtime he worked on the Alabama Power contract at the hourly rate of $23.08.  The memo references the prior memorandum from Collins that stated "full-time hourly" employees would be paid his or her hourly rate for overtime hours worked.  (P-6) (TR 224, 237).  On September 1, 1995, Collins sent Fahy a reply memo, stating "You will only be paid overtime for billable projects, i.e. APCo. [Alabama Power].  Overtime will only be paid when a project specifies overtime payment."  (P-7).  Collins treated this as a request for "extra time" pay, not overtime pay.  (TR 226-28).

[12] Perkins testified that Fahy's pay was always calculated using an hourly rate – even when he was a salary employee– because his pay was deducted from various funds assigned to different projects he was working.  (TR 169-72).  To pay him his salary amount, they would multiply the hourly rate by 80 hours every pay period.  (TR 171-72).

[13] From the beginning of the "known" payroll records in November 1995, Fahy's rate of pay is shown as $23.08 per hour.  (P-13).  (TR 174-75).  For the pay period ending 05/06/96, Fahy is shown still at $23.08 per hour.  (P-14).  For the pay period ending 05/19/96, Fahy is shown to have his rate increased to $24.46 per hour.  (P-15).  According to Perkins's testimony and BVI's records, Fahy's "salary" was increased on May 6, 1996 "from $48,000 to $50,880.00 annually."  (TR 172-73) (D-9).  The increase was intended "to compensate [Fahy] for [his] efforts at [Alabama Power].  (D-9).  Fahy was changed from an hourly rate of $24.46 per hour to a biweekly salary of $1,956.92 for the pay period ending 09/21/97.  (Compare P-13 to 16 with P-17).  This change reflects Mr. Fahy moving from the Alabama Power project to replace Cristyl Collins at the BVI office and is evidenced by a personnel change report.  (TR 139-40; P-20).

[14] Perkins did backup work for Fahy at BellSouth when Fahy began working the extra hours at Alabama Power.  (TR 172).

was shown on the Personnel Change Report as an hourly employee. (TR 140; P-20). She also did not supervise anyone.

On December 12, 1997, Perkins wrote Fahy a letter notifying him that Fahy was being laid off due to loss of business volume. (P-10). Fahy was never paid time and a half for any hours worked for BVI, (TR 37), and while he was working at BVI, he never complained or mentioned the issue. (TR 92).

Fahy and other employees were entered into the computer system at the hourly equivalent of their salary. (TR 171). Their pay would be entered as eighty hours at the hourly rate every two weeks, but it was treated like the pay of a salaried employee. (TR 171). Perkins stated that this was helpful for accounting when employees worked across multiple projects and were being paid out of different funds. (TR 171).

The BVI Personnel Policy Manual, page 27, states, "[a]pproved overtime will be paid at a rate of one and a half times the base hourly wage. If the employee is salaried, the hourly rate will be computed using a factor of 2,080 work hours in a work year." (P-11). Written on the page of the manual are the words, "Contract employees are paid based on contractual terms between customer and BVI." (P-11). Mr. Perkins wrote the information on the page, but cannot recall when he wrote it, but it was some time between 1991 and 1996. (TR 131). According to Perkins, BVI's personnel policies were developed pro bono by graduate students at UAB. (TR 196). Perkins does not know the qualifications of the students who wrote the policies. (TR 197).

Perkins testified that he worked in the BVI office in the early part of 1995, but was out of the office more and more as the year went on, and was only in the office one or two days a week at the end of the year. (TR 120). Perkins said that his involvement with the Alabama Power

7

contract was very limited when BVI first started doing business with them. (TR 121).  Perkins

went back into being actively involved in the business in August of 1996 after being absent while

he ran for Mayor of Selma. (TR 208)(see also TR 39-40).

## II.  DISCUSSION

### A.  Coverage of the FLSA

#### 1.  Generally

The FLSA requires employers that are sufficiently involved in interstate commerce to pay

overtime to employees who work more than forty hours per week and are not specifically

exempted.  29 U.S.C. § 207(a)(1).  The defendants assert that the contract services provided by

BVI are not covered under the FLSA.  Specifically, they assert that the type of work performed

by Fahy does not fall within the constraints of the FLSA because service contracts, records,

reports and training do not constitute goods.  They cite *Mitchell v. Welcome Wagon*, 139 F. Supp.

674 (W.D. Tenn. 1954), *aff'd per curiam*, 232 F.2d 892 (6th Cir. 1956), in support of their

position.

The FLSA provides:

Except as otherwise provided in this section, no employer shall employ any of his
employees who in any workweek is engaged in commerce or in the production of
goods for commerce, or is employed in an enterprise engaged in commerce or in
the production of goods for commerce, for a workweek longer than forty hours
unless such employee receives compensation for his employment in excess of the
hours above specified at a rate not less than one and one-half times the regular rate
at which he is employed.

29 U.S.C. § 207(a)(1).  As previously noted by this court, this language is consistent with the

FLSA minimum wage provision. *See* 29 U.S.C. § 206(a).[15]  The FLSA further provides:

> "Enterprise engaged in commerce or in the production of goods for commerce" means an enterprise that–
>
> > (a)(i) has employees engaged in commerce or in the production of goods for commerce, or that has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person; and
> >
> > (ii) is an enterprise whose annual gross volume of sales made or business done is not less than $500,000 (exclusive of excise taxes at the retail level that are separately stated);
> >
> > . . . .

29 U.S.C. § 203(s)(1)(A).

"'Commerce' means trade, commerce, transportation, transmission, or communication among the several States or between any State and any place outside thereof."  29 U.S.C. § 203(b).  "'Goods' means . . . wares, products, commodities, merchandise, or articles or subjects of commerce of any character, or any part or ingredient thereof, but does not include goods after their delivery into the actual physical possession of the ultimate consumer thereof other than a producer, manufacturer, or processor thereof."  29 U.S.C. § 203(i).

### 2.  Defendants' Claim That the FLSA is Not Applicable

Fahy alleges in the original complaint that BVI was "an employer and enterprise regularly engaged in interstate commerce" and that "[h]e was regularly employed by defendant in interstate commerce."  (Doc. 1, ¶¶ 3, 4).  Defendant BVI disputes this in its answer.  (Doc. 5, ¶

---

[15] 29 U.S.C. § 206 provides:

Every employer shall pay to each of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, wages at the following rates. . . .

4). In the motions to dismiss and for summary judgment (and in the accompanying brief), which were previously denied, the defendants asserted that the court lacked jurisdiction because the FLSA does not apply to service contracts such as that between BVI and Alabama Power. (Docs. 6, 26, 27 & 28). At the conclusion of the plaintiff's case, the defendants again asserted that the services provided by Fahy to Alabama Power are not under the FLSA. (TR 211). They again cite to *Mitchell*. (*Id.*; doc. 47, pp. 3-4).

The defendants do not dispute that the record demonstrates that Fahy and BVI were providing services on contracts involving large companies engaged in interstate commerce, particularly BellSouth and Alabama Power Company. (*See e.g.*, TR 117-18). The record further reflects, through Mr. Perkins' testimony, that BVI had an annual gross volume of sales in excess of $500,000. (TR 119). Instead, they claim that the services rendered by Fahy are not covered.

The court finds that *Mitchell* is not controlling for numerous reasons. First, it is factually distinguishable from the present case. Second, the FLSA has undergone numerous amendments and changes since 1954. Third, the United States Supreme Court has made it clear that the FLSA is to be construed broadly.

Concerning the first matter, that *Mitchell* is factually inapposite, even a cursory review of that opinion and the present matter demonstrates the differences. In *Mitchell*, the court held that Welcome Wagon hostesses who provided written reports to local businesses concerning the buying habits of local families were not engaged in commerce nor in the production of goods for commerce within the meaning of the FLSA. Unlike the employees in *Mitchell*, it is undisputed that Fahy worked on contracts for large corporations that are involved in interstate commerce. Additionally, work he did under BVI's contract with Alabama Power was to produce

10

documentation of Alabama Power's budgeting program to be used in the budgeting department

(TR 24, 135), which is certainly part of Alabama Power's activities in commerce and its

production of a product for sale so as to meet the requirement of § 207(a)(1) that the employee be

"*engaged in commerce* or in the production of goods for commerce, *or . . . employed in an*

*enterprise engaged in commerce* or in the production of goods for commerce." Fahy's

involvement with Alabama Power through his work with BVI evidences the requisite nexus to

bring the present matter within this court's jurisdiction.[16]  *See* 29 C.F.R. § 776.9 (the FLSA

includes individuals employed "in the channels of" commerce).

Concerning the second matter, the changes made to the FLSA since 1954, a review of the

history of the statute evidences that this court should not take a restrictive view of its application.

To the contrary, the expanded scope of the FLSA has been noted.  *See Cruz v. Chesapeake*

*Shipping, Inc.*, 932 F.2d 218, 225-26 (3rd Cir. 1991) ("the Act is to be applied to 'the furthest

reaches consistent with congressional direction"), (citing *Mitchell v. Lublin, McGraughy &*

*Assoc.*, 358 U.S. 207, 211, 79 S. Ct. 260, 264, 3 L. Ed. 2d 243 (1959).   The "Statements of

General Policy or Interpretation Not Directly Related to [the FLSA] Regulations" provide, in

pertinent part:

> (b) "*Articles or subjects of commerce of any character.*"  It will be
> observed that "goods" as defined in the act are not limited to commercial goods or
> articles of trade, or, indeed, to tangible property, but include "articles or subjects
> of commerce of *any character*["] (emphasis supplied). [ ] It is well settled that
> things such as "ideas, * * * orders, and intelligence" are "subjects of commerce."
> Telegraphic messages have, accordingly, been held to be "goods" within the
> meaning of the act. [ ] Other articles or subjects of commerce which fall within

---

[16] This is consistent with the statement in *Mitchell* that "[i]n determining coverage [under the FLSA], it is immaterial whether the employee is hired by one engaged in an interstate business, since it is the activities of the employee and not of the employer which are decisive."  *Id.*, 139 F. Supp. at 678.

the definition of "goods" include written materials such as newspapers, magazines, brochures, pamphlets, bulletins, and announcements; [ ] written reports, fiscal and other statements and accounts, correspondence, lawyers' briefs and other documents; [ ] advertising, motion picture, newspaper and radio copy, artwork and manuscripts for publication; [ ] sample books; [ ] letterheads, envelopes, shipping tags, labels, check books, blank books, book covers, advertising circulars and candy wrappers. [ ] Insurance policies are "goods" within the meaning of the act; [ ] so are bonds, stocks, bills of exchange, bills of lading, checks, drafts, negotiable notes and other commercial paper. [ ] "Goods" includes gold; [ ] livestock; [ ] poultry and eggs; [ ] vessels; [ ] vehicles; [ ] aircraft; [ ] garments being laundered or rented; [ ] ice; [ ] containers, as, for example, cigar boxes or wrapping paper and packing materials for other goods shipped in commerce; [ ] electrical energy or power, gas, etc.; [ ] and by-products, [ ] to mention only a few illustrations of the articles or subjects of "trade, commerce, transportation, transmission, or communication among the several States, or between any State and any place outside thereof" which the act refers to as "goods." The act's definitions do not, however, include as "goods" such things as dams, river improvements, highways and viaducts, or railroad lines. [ ]

29 C.F.R. § 776.20 (footnotes omitted).

Concerning the third matter, Supreme Court interpretation of the FLSA, this court is required to give the statute broad application. As one court has noted,

> [t]he Supreme Court has held that the FLSA is to be construed broadly to apply to the farthest reaches consistent with congressional direction. *Overstreet v. North Shore Corp.*, 318 U.S. 125, 63 S. Ct. 494, 87 L. Ed. 656 (1943). Further, Congress intended the FLSA "to extend federal control in this field throughout the farthest reaches of channels of interstate commerce." *Walling v. Jacksonville Paper Co.*, 317 U.S. 564, 567-68, 63 S. Ct. 332, 335, 87 L. Ed. 460 (1943) ("Where wholesale distributor of paper products picked up at terminals of interstate carriers goods destined to specific customers, no mere placing of goods in wholesale distributor's warehouse for checking before delivery to customers could take the goods out of 'commerce' so as to render inapplicable the FLSA.").

*Herman v. Hospital Staffing Services, Inc.*, 236 B.R. 377, 384-85 (W.D. Tenn. 1999). In another case dealing with the scope of the FLSA, the Court stated:

> We are dealing with a different Act of another vintage--one that has been given a liberal construction from *Kirschbaum Co. v. Walling*, 316 U.S. 517, 62 S. Ct. 1116, 86 L. Ed. 1638 [(1942)], to *Alstate Construction Co. v. Durkin*, 345 U.S.

12

> 13, 73 S. Ct. 565, 97 L. Ed. 745 [(1953)]. The question whether an employee is engaged 'in commerce' within the meaning of the present Act is determined by practical considerations, not by technical conceptions. *See Walling v. Jacksonville Paper Co.*, 317 U.S. 564, 570, 63 S. Ct. 332, 336, 87 L. Ed. 460; *Overstreet v. North Shore Corp.*, 318 U.S. 125, 128, 130, 63 S. Ct. 494, 496, 497, 87 L. Ed. 656. The test is whether the work is so directly and vitally related to the functioning of an instrumentality or facility of interstate commerce as to be, in practical effect, a part of it, rather than isolated local activity. *See Macleod v. Threlkeld*, 319 U.S. 491, 497, 63 S. Ct. 1248, 1251, 87 L. Ed. 1538. Repair of facilities of interstate commerce is activity 'in commerce' within the meaning of the Act as we held in *Fitzgerald Const. Co. v. Pedersen*, 324 U.S. 720, 65 S. Ct. 892, 89 L. Ed. 1316. And we think the work of improving existing facilities of interstate commerce, involved in the present case, falls in the same category.[ ]

*Mitchell v. C.W. Vollmer & Co.*, 349 U.S. 427, 429-30, 75 S. Ct. 860, 862, 99 L. Ed. 1196 (1955) (footnote omitted).

In view of the foregoing authorities and facts, this court is satisfied that Fahy has established the applicability of the FLSA to the work he did for BVI. This element of his claim having been satisfied, the defendants' motion for judgment as a matter of law is due to be denied on this ground.

### B. Statute of Limitations

#### 1. Willfulness

The FLSA provides that an action must be commenced within two years "except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued." 29 U.S.C. § 255(a). The employee bears the burden of showing that his former employer's violation of the Act was willful. *See McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 135, 108 S. Ct. 1677, 100 L. Ed. 2d 115 (1988). Accordingly, if Fahy can show that the defendants willfully violated the FLSA, they will be liable for the pay violations during the relevant three years, instead of two years. *Herman v. RSR Security Services Ltd.*, 172 F.3d 132,

13

141 (2nd Cir. 1999).

The plaintiff asserts that the defendants' violation of the FLSA was willful and the three-year statute of limitations should apply.[17]  The defendants assert that certain of the claims are necessarily precluded because they are beyond the applicable two-year statute of limitations.  A violation of the FLSA is willful if "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute"-- mere negligence is not enough. *Richland Shoe,* 486 U.S. at 133.

Perkins stated at trial that he believed the requirement to pay time and a half to employees was dependent on whether a contract pays time and a half for hours worked over forty and if BVI specifically authorizes the employee to work over forty hours in a week.[18]  In determining this,

---

[17] The authority the plaintiff cites for the standard of willfulness is *Joiner v. City of Macon,* 814 F.2d 1537 (11th Cir. 1987). *Joiner* relies on *Reeves v. International Tel. & Tel. Corp.,* 616 F.2d 1342, 1352-53 (5th Cir. 1980). *Reeves* in turn uses the standard for willfulness set forth in *Coleman v. Jiffy June Farms, Inc.,* 458 F.2d 1139 (5th Cir. 1971) (holding that an action is "willful" if there is substantial evidence that the employer "knew or suspected that his actions might violate the FLSA" i.e., if he merely knew that the FLSA was "in the picture"). In *McLaughlin v. Richland Shoe Co.,* the Supreme Court stated that the "*Jiffy June*" standard "virtually obliterates the distinction between willful and nonwillful violations" (*Richland Shoe*, 486 U.S. at 132-33), and rejected it in favor of the standard employed in *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 105 S. Ct. 613, 83 L. Ed. 2d 523 (1985). *See Heidtman v. County of El Paso,* 171 F.3d 1038, 1042 n.4 (5th Cir. 1999).

[18] Mr. Perkins' testimony consisted of the following:

Q.     Okay.  On your Skilled Labor Force people, did they on occasion work overtime?

A.     I don't think so.

Q.     If they had, would you have owed them time and a half?  These are the technical clerical type people.

A.     If under the state contract, the state had allowed them or requested that they work overtime, the state should have paid them overtime.  But it is my recall that under the state purchase order, overtime was prohibited.

Q.     If, for example, someone just worked fifty hours a week and it happened as a mistake, somebody let them work fifty hours in a week, wouldn't you have owed time and a half for that extra ten hours?

14

Perkins relied on his "years of experience." (TR 126). There is nothing to indicate that Perkins

actually knew that this belief was incorrect. Accordingly, the question therefore is whether he

showed "reckless disregard for the matter of whether [his] conduct was prohibited by the

statute." *Richland Shoe,* 486 U.S. at 133.

     After a thorough review of the record, the court finds that the defendants showed

"reckless disregard" by failing to pay overtime compensation to Fahy. Fahy met his burden by

showing that the violation was "willful" under the FLSA and that the three-year statute of

limitations therefore applies. As evidence, he points out that he was a salaried FLSA-exempt

employee for the first five or so months that he worked for BVI. However, when he changed

responsibilities in August 1995, his status under the FLSA changed. He discussed the change,

which included his being paid by the hour instead of the flat biweekly rate, with his supervisor,

Collins, and it was approved by Perkins. The available time sheets show the change. He was

---

A.    I don't know.

Q.    You don't know. Did you ever carry out any investigation to determine your
obligations about that?

A.    Well, it really was a matter of -- as it related to my understanding and my application
of overtime, if it was not authorized, it would not have been done. And the issue of time and a
half was not something that's foreign. But all of the specific terms and conditions upon which it
applies, I can't tell you what they are.

Q.    Okay. Well, what about, for example, if a secretary that worked at Business Ventures, one of your
employees that you weren't contracting out --

A.    Okay.

Q.    -- did you understand that you had to pay that person time and a half for hours over
forty?

A.    If we requested that they worked that extra time, then, yes."

(TR 126-28).

treated differently until August 1997 when he was promoted to Collins' supervisory position back at BVI. When that event occurred, the BVI paperwork again shows the change back to a flat biweekly rate. Further, the interoffice memoranda during August 1995 indicate that BVI and Perkins were aware of the need to pay overtime in the appropriate instances. Still further, the record clearly demonstrates that BVI's accountant questioned Fahy's "status change" and the payment of "extra overtime hours." (TR 169). In response to the accountant's inquiry, Perkins wrote:

> Good question.
>
> Steve is not being paid overtime. Wrong language. He is being paid his salary plus extra hours worked over forty per week. Nothing else changes. I agreed to this because he is working a great deal of hours on the APCo [Alabama Power Company] contract that we are being paid for and it is only fair that we pay him for his efforts. He will continue to manage PIICO, BellSouth and hopefully he will generate new business at APCo. I will pick up the slack at BellSouth.
>
> No, we will not be able to increase billing to APCo. They will not pay O/T rate. That is why I am proposing to do it this way.
>
> Let me know if I am missing anything, if we need to change payroll, A/R [(Accounts Receivable)], or anything. I cannot think of anything. I will discuss this with Crystal [sic] and Shirley. To them the results are the same, I understand to you, it is different.

(D-8). Shortly after this memorandum, Collins sent an interoffice memorandum to Fahy stating that "[y]ou will only be paid overtime for billable projects, APCo. Overtime will only be paid when a project specifies overtime payment." (P-7). Thereafter, many of Fahy's time sheets reflect overtime activity by Fahy. (P-11). Through these facts, Fahy has demonstrated that the defendants acted with reckless disregard (*i.e.* "willfully") in failing to pay him overtime required by the FLSA and that a three-year statute of limitations thus applies.

16

In this case, the action "'accrues' when the employer fails to pay the required compensation for any workweek at the regular pay day for the period in which the workweek ends." 29 C.F.R. § 790.21(b). Accordingly, any failure of the defendant to pay Fahy required overtime compensation on a regular payday occurring on or after the dates specified below will be within the statute of limitations.

### 2. Relation Back

The defendants assert that because Perkins was not formally served pursuant to FEDERAL RULE OF CIVIL PROCEDURE 4, until July 14, 1999, many of the plaintiff's claims against him are time barred. (Doc. 47, ¶ 5).[19] Reading Perkins's arguments liberally, he appears to be asserting that the claims against him are barred because the period for initiating a claim against him under the statute of limitations had lapsed by the time he was served. (Id., ¶ 4). He further asserts there is no relation back under FEDERAL RULE OF CIVIL PROCEDURE 15(c). The plaintiff does not address this issue in his post-trial brief.

Rule 15(c) provides, in pertinent part:

> (c) **Relation Back of Amendments**. An amendment of a pleading relates back to the date of the original pleading when
>
> (1) relation back is permitted by the law that provides the statute of limitations applicable to the action, or

---

[19] In addressing this claim, Perkins also notes that the court referenced the fact in its opinion denying summary judgment that there had been no objection to the amendment by the defendants (*see* doc. 34, p. 15). (Doc. 47, ¶ 5). Counsel noted, "However, the motion for leave was filed on November 3, 1998. The next day, it was granted by the court and faxed to counsel for BVI. Counsel did not have a copy of the amendment prior to the action by the court. The motion did not arrive by mail until a couple of days later. The order had already been entered." (*Id.*). The foregoing chronology asserted by defense counsel appears, as best as the court can determine, to be correct. The decision by this court to allow the amendment was not contrary to any scheduling order (in fact, the scheduling order was entered consistent with the parties report on November 30, 1998). (Doc. 15). Additionally, the defendants did not prior to the post-trial proceedings complain about the court allowing the amendment. Finally, they never asked this court at any time to reconsider its ruling on the motion.

(2) the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, or

(3) the amendment changes the party or the naming of the party against whom a claim is asserted if the foregoing provision (2) is satisfied and, within the period provided by Rule 4(m) for service of the summons and complaint, the party to be brought in by amendment (A) has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits, and (B) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party.

FED. R. CIV. P. 15(c).  The Advisory Committee Notes to the 1991 Amendment to Rule 15(c)(3) state that the amendment was intended to address "'the problem of a misnamed defendant' and to allow a party 'to correct a formal defect such as a misnomer or misidentification.'" *Preston v. Settle Down Enterprises, Inc.*, 90 F. Supp. 2d 1267, 1277 (N.D. Ga. 2000) (citing FED. R. CIV. P. 15(c)(3), Advisory Committee Notes to 1991 Amendment).  In *Wayne v. Jarvis*, 197 F.3d 1098 (11th Cir. 1999), *cert. denied*, ___U.S.___, 120 S. Ct. 974, 146 L. Ed. 2d 804 (2000), the Eleventh Circuit examined the question of whether a plaintiff's attempt to amend his complaint by replacing "John Doe" defendants with specifically-named defendants  was permitted under Rule 15(c).  The court stated that

Because [plaintiff] Wayne changed the parties being sued after the statute of limitations had expired, his claim against the belatedly-named deputy sheriffs is barred unless he can demonstrate that under Rule 15(c) the amended complaint naming them relates back to the original complaint, which was filed just before the statute ran. . . .  The district court ruled that Wayne's lack of knowledge regarding the identities of the deputy sheriff defendants did not constitute a "mistake concerning the identity of the proper party" for the purposes of Rule 15(c)(3)(B), and therefore that his amended complaint did not relate back.  Wayne argues that his lack of knowledge is the equivalent of a "mistake" and therefore satisfies the Rule 15(c)(3)(B) requirement.

We agree with the district court that Wayne's lack of knowledge regarding

18

the identities of the deputy sheriffs was not "a mistake concerning the identity of the proper party."[20]  The drafters of Rule 15(c)(3) included the mistake proviso, as the commentary explains, in order to resolve "the problem of a misnamed defendant" and allow a party "to correct a formal defect such as a misnomer or misidentification."  FED R. CIV. P. 15(c)(3), Advisory Committee Notes to 1991 Amendment.  As the Second Circuit observed, "[t]his commentary implies that the rule is meant to allow an amendment changing the name of a party to relate back to the original complaint only if the change is the result of an error, such as a misnomer or misidentification."  *Barrow* [v. *Wethersfield Police Dep't.*, 66 F.3d [466,] 469 [(2nd Cir. 1995)].  Because Wayne's lack of knowledge was not an error, a misnomer, or a misidentification, his amendment does not come within Rule 15(c)(3)(B).  While we have stated that "we read the word 'mistake' in Rule 15(c) liberally," *Itel Capital Corp. v. Cups Coal Co.*, 707 F.2d 1253, 1258 n.9 (11th Cir. 1983), we do not read the word "mistake" to mean "lack of knowledge." For these purposes, ignorance does not equate to misnomer or misidentification.

*Wayne*, 197 F.3d at 1103.  Similarly, in *Powers v. Graff*, 148 F.3d 1223, 1226-27 (11th Cir.

1998), the court stated:

The purpose of Rule 15(c) is to permit amended complaints to relate back to original filings for statute of limitations purposes when the amended complaint is correcting a mistake about the identity of the defendant. *See Worthington v. Wilson*, 8 F.3d 1253, 1256 (7th Cir. 1993) (Relation back applies where the amendment is made "to correct a misnomer of a defendant where the proper defendant is already before the court and the effect is merely to correct the name under which he is sued."). *See generally Hill v. United States Postal Serv.*, 961 F.2d 153 (11th Cir. 1992) (permitting pro se plaintiff's amended complaint to relate back when he mistakenly named postal service instead of postmaster as defendant, contrary to statutory requirements); *see also Schiavone v. Fortune*, 477 U.S. 21, 106 S. Ct. 2379, 91 L. Ed. 2d 18 (1986).  "[The Rule] permits an amendment to relate back only where there has been an error made concerning the identity of the proper party and where that party is chargeable with knowledge of the mistake, but it does not permit relation back where . . . there is a lack of knowledge of the proper party."  *Worthington*, 8 F.3d at 1256 (emphasis added).

"A potential defendant who has not been named in a lawsuit by the time the statute of limitations has run is entitled to repose--unless it is or should be apparent to that person that he is the beneficiary of a mere slip of the pen, as it

---

[20] "We discuss only the mistake requirement of Rule 15(c)(3), because where that showing is not made there can be no relation back regardless of whether other requirements, such as notice and lack of prejudice to the joined party, are met." *Wayne*, 197 F.3d at 1103 n.5.

were." *Rendall-Speranza v. Nassim*, 107 F.3d 913, 918 (D.C. Cir. 1997). Contrary to this idea, Plaintiffs argue that they are entitled to relation back because, although they knew early in the litigation that Defendants controlled Stuart-James (a named defendant), Plaintiffs did not learn until later that the control persons might be proper defendants.

We disagree that these alleged facts entitle Plaintiffs to relation back. "The Advisory Committee Notes (1991) state that Rule 15(c) deals with 'the problem of a misnamed defendant' . . . . Nothing in the Rule or in the Notes indicates that the provision applies to a plaintiff who was fully aware of the potential defendant's identity but not its responsibility for the harm alleged." *Id.*

Before the statute of limitations period ran, Plaintiffs knew Defendants' identities.[21] As the district court seemingly found, only when Stuart-James faced possible insolvency did Plaintiffs amend their complaint to add these known Defendants. "[E]ven the most liberal interpretation of 'mistake' cannot include a deliberate decision not to sue a party whose identity plaintiff knew from the outset." *Wells*, 813 F. Supp. at 1567.

Not only did Plaintiffs know the identity of Defendants before expiration of the limitations period--justifying the district court's refusal to allow relation back under Rule 15(c)--Plaintiffs also should have known that Defendants would be proper parties to the suit, that is, persons arguably liable for the alleged wrongdoing.[22] . . .

Thus, under subsection (3), an amendment, such as the one permitted in this case,

allowing the addition of Perkins as a defendant, relates back to the original complaint only if

(1) the claim against Perkins arose out of the conduct as set forth in the initial complaint;

(2) Perkins received notice of the institution of the action so that he is not prejudiced and (3) he

---

[21] "No later than April 1988, the date of Defendant Geman's deposition, the details of Stuart-James's ownership and management structure were known to Plaintiffs. At that point, if not sooner, the identity of Stuart-James's control persons was known." *Powers*, 148 F.3d at 1227 n.7.

[22] "In the light of the law and circumstances, Plaintiffs did know or should have known very early that Defendants could be proper parties. The same law and circumstances would give Defendants no reason to believe that they were omitted from the original complaint on account of mistake, as opposed to some kind of strategic choice by Plaintiffs. See FED. R. CIV. P. 15(c)(3)(B). Thus for this reason too, the attempted amendment should not relate back to the date of that original complaint. *Powers*, 148 F.3d at 127 n.8.

20

"knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against [him]." FED. R. CIV. P. 15(c); *See also Hill v. United States Postal Service*, 961 F.2d 153, 155 (11th Cir. 1992).

The first criteria is easily established because the cause of action against Perkins arose out of the facts alleged in the original complaint. The second criteria is also established since Perkins was the President of BVI, his counsel was served with the amended complaint in early November 1998, approximately sixty days after the filing of the original complaint.[23] The record fails to demonstrate any prejudice to Perkins as a consequence of allowing the amendment.

However, the third criteria cannot be established to invoke relation back because the filing of the amended complaint is not the correction of a "mistake" as that term is contemplated by the Rule and the Eleventh Circuit decisions cited above. In the motion to amend the complaint, counsel for the plaintiff stated, "It now appears that defendant Business Ventures may not be actively doing business at the present time, although it is still an active corporation. On information and belief, James Perkins, Jr. is the alter ego of Business Ventures. . . ." (Doc. 11). The relevant issue in this case is whether the amendment seeks to correct a "mistake" about the identity of the original defendant. *Chumney v. U.S. Repeating Arms Co., Inc.*, 196 F.R.D. 419, 429, 2000 WL 1336476, *10-11 (M.D. Ala. 2000). The court finds that the reason for the amendment was not that Fahy was mistaken as to the identity of the proper defendant when he filed the original complaint. It appears from the record before the court that, for whatever reason, Fahy made a conscious choice initially not to sue Perkins. Thus, Rule 15(c) does not apply in

---

[23] A review of his January 21, 1999, deposition also shows that at the time he was deposed, Perkins was aware that he was named as a defendant in this lawsuit. (Doc. 33, Exhibit 2, p. 8).

this instance.

Given that the amended complaint does not "relate back," the court must next determine when the limitations period ends for purposes of Perkins's liability. An action is commenced under the FLSA when a complaint is filed. 29 U.S.C. §§ 255, 256. Under section 216(b), "[n]o employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought." 29 U.S.C. § 216(b). Because Fahy's written consent was filed on October 19, 1998, that is the date this action commenced as to BVI. Therefore, the statute of limitations began to run on October 19, 1995. Because an action generally commences simply upon the filing of a complaint (*see Caldwell v. Martin Marietta Corp.*, 632 F.2d 1184, 1188 (5th Cir. 1980)), this action was commenced against Perkins when the amended complaint was filed on November 4, 1998, meaning the statute of limitations began to run on November 5, 1995.[24] (Doc. 13).

## C. Exemptions to the FLSA

The defendants next assert that the FLSA does not cover Fahy because he falls within certain applicable exceptions thereto. (Doc. 47, p. 2). *See* 29 U.S.C. § 213(a)(1).[25] Section

------

[24] This is the end of the first workweek within the statutory period.

[25] Section 213 provides, in pertinent part:

(a) Minimum wage and maximum hour requirements

The provisions of section 206 (except subsection (d) in the case of paragraph (1) of this subsection) and section 207 of this title shall not apply with respect to--

(1) any employee employed in a bona fide executive, administrative, or professional capacity (including any employee employed in the capacity of academic administrative personnel or teacher in elementary or secondary schools), or in the capacity of outside salesman (as such terms are defined and delimited from time to time by regulations of the Secretary, subject to the provisions of subchapter II of chapter 5 of Title 5, except that an employee of a retail or service establishment shall not be excluded from the definition of employee employed in a bona fide executive or administrative capacity because of the

213(a)(1) exempts employees serving in a "bona fide executive, administrative, or professional capacity." *Id.* These terms are further defined by the applicable regulations. *See* 29 C.F.R. Part 541. The defendants assert that Fahy falls under all three of these exceptions.

In examining this issue, the inquiry must be made on a "workweek" basis. 29 C.F.R. §§ 778.103-105. As Fahy points out, an employee may be covered during a portion of his employment period and exempted during other times. Thus, the pertinent inquiry is whether Fahy was serving in an executive, administrative, or professional capacity during any of the relevant time period. The Tenth Circuit Court of Appeals in *Bohn v. Park City Group, Inc.*, 94 F.3d 1457 (10th Cir. 1996), stated:

> It is the employer's burden to prove that a plaintiff falls within the ... exemption, *Corning Glass Works v. Brennan*, 417 U.S. 188, 196-97, 94 S. Ct. 2223, 2229, 41 L. Ed. 2d 1 (1974), and the exemption is construed narrowly against the employer who seeks to assert it. *See Arnold v. Ben Kanowsky, Inc.,* 361 U.S. 388, 392, 80 S. Ct. 453, 456, 4 L. Ed. 2d 393 (1960). "[T]he inquiry into exempt status under [§ 213(a)(1)] remains intensely fact bound and case specific." *Dalheim v. KDFW-TV*, 918 F.2d 1220, 1226 (5th Cir. 1990).

*Bohn*, 94 F.3d at 1461.

### 1. Executive Capacity

The defendants first assert that Fahy is exempt from the FLSA under the "*bona fide executive*" provisions. Generally, for an employee to fall within this exemption, the employer must show that the employee performed the duties listed below in sections (a) through (e) and is paid on a salary basis per section (f).

_____

number of hours in his workweek which he devotes to activities not directly or closely related to the performance of executive or administrative activities, if less than 40 per centum of his hours worked in the workweek are devoted to such activities);

. . . .

23

The term *"employee employed in a bona fide executive * * * capacity"* in section 13(a)(1) of the Act shall mean any employee:

(a) Whose primary duty consists of the management of the enterprise in which he is employed or of a customarily recognized department of subdivision thereof; and

(b) Who customarily and regularly directs the work of two or more other employees therein; and

(c) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring or firing and as to the advancement and promotion or any other change of status of other employees will be given particular weight; and

(d) Who customarily and regularly exercises discretionary powers; and

(e) Who does not devote more than 20 percent, or, in the case of an employee of a retail or service establishment, who does not devote as much as 40 percent, of his hours of work in the workweek to activities which are not directly and closely related to the performance of the work described in paragraphs (a) through (d) of this section: Provided, that this paragraph shall not apply in the case of an employee who is in sole charge of an independent establishment or a physically separated branch establishment, or who owns at least a 20-percent interest in the enterprise in which he is employed; and

(f) Who is compensated for his services on a salary basis at a rate of not less than $155 per week (or $130 per week, if employed by other than the Federal Government in Puerto Rico, the Virgin Islands, or American Samoa), exclusive of board, lodging, or other facilities: Provided, that an employee who is compensated on a salary basis at a rate of not less than $250 per week (or $200 per week, if employed by other than the Federal Government in Puerto Rico, the Virgin Islands or American Samoa), exclusive of board, lodging, or other facilities, and whose primary duty consists of the management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof, and includes the customary and regular direction of the work of two or more other employees therein, shall be deemed to meet all the requirements of this section.

29 C.F.R. § 541.1 (emphasis in original).

24

The CODE OF FEDERAL REGULATIONS contains a special provision for "high salaried executives." The provision includes within the definition of "executive" employees "managerial employees who are compensated on a salary basis at a rate of not less than $250 per week exclusive of board, lodging, or other facilities." 29 C.F.R. § 541.119.

> Such a highly paid employee is deemed to meet all the requirements in paragraphs (a) through (f) of § 541.1 if the employee's primary duty consists of the management of the enterprise in which employed or of a customarily recognized department thereof and includes the customary and regular direction of two or more other employees therein. If an employee qualifies under this proviso, it is not necessary to test that employee's qualifications in detail under paragraphs (a) through (f) of § 541.1 of this part.

*Id.*

### a. Rate of Pay

Fahy's base rate of pay was $932.20 per week until May of 1996, when it was increased to $978.40 per week. Both rates are in excess of the $250.00 minimum for a high salaried executive. Because the amount of pay Fahy received qualifies him for the "high salaried executive" provision, that analysis will be used.

### b. Salary Basis

The regulations require that an employee be paid on a salaried basis in order to qualify as a bona fide executive, administrative, or professional employee.[26] 29 C.F.R. §§ 541.1-541.3. "An employee will be considered to be paid 'on a salary basis' within the meaning of the regulations if under his employment agreement he regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting *all or part* of his

---

[26] Under 29 C.F.R. § 541.312, an employee may qualify as a computer professional if he or she is paid at an hourly rate in excess of six and one half times the federal minimum wage.

25

compensation, which amount is not subject to reduction because of variations in the quality or quantity of work performed." 29 C.F.R. § 541.118(a) (emphasis added).

Fahy contends that he was not salaried because he was not paid a "fixed amount per week" during the relevant period. The regulations state, however, that "additional compensation besides the salary is not inconsistent with the salary basis of payment." 29 C.F.R. § 541.118(b). "The [Department of Labor] Secretary 'has unequivocally and consistently declared that additional compensation in the form of hourly overtime payment does not defeat exempt status under the salary basis test.' *Boykin v. Boeing Co.*, 128 F.3d 1279, 1281 (9th Cir. 1997); *see* e.g., D.O.L Wage & Hour Opinion Letter, 1997 WL 998013 (March 17, 1997). 'Because the salary-basis test is a creature of the Secretary's own regulations, his interpretation of it ... is controlling unless plainly erroneous or inconsistent with the regulation.' *Auer [v. Robbins*, 519 U.S. 452, 461,] 117 S. Ct. 905, 911, [137 L. Ed. 2d 79 (1997)]." *Fife v. Harmon*, 171 F.3d 1173, 1175 (8th Cir. 1999). Fahy's additional hourly compensation from August of 1995 to August of 1997 does not, without more, preclude him from exempt status. If Fahy had a guaranteed minimum amount that he received regardless of the quality or quantity of work performed then he was a salaried employee even though his salary was based on an hourly system for payment and accounting purposes. *See Hood v. Mercy Healthcare Arizona*, 23 F. Supp. 2d 1125 (D. Ariz. 1997).

Thus, the determinative question is whether Fahy had a guaranteed minimum amount that was not subject to reduction. The first fact to note is that Fahy was never paid an amount less than 1/26th of his annual salary in any two-week pay period and that he never accumulated less than forty hours of pay in a work week. The testimony and exhibits show that in any week in which Fahy worked less than forty hours, he received some form of leave time to ensure that he

26

never received less than the appropriate portion of his annual salary. (*See* TR 145, 201, 203). This is true even in instances where he did not have the necessary sick or vacation leave available. (*See* TR 182-85; D-14). In support of his claim that he was an hourly employee who did not have a guaranteed minimum pay, Fahy stated he "had *anticipated* that [he] would be paid hours worked, whether they were more than 40 or less than 40." (TR 37). He, however, does not articulate what he based his expectation on, or who, if anyone, made this representation to him. Upon review of the record, the court is convinced that Fahy's pay was not subject to reduction based on the quality or quantity of work performed.

Fahy contends in his post-trial brief that he would be subject to pay deductions for partial day absences if he did not have available leave and that an employee who is subject to deductions for absences of less than a day is not paid on a salary basis. The authority cited for his contention is *Martin v. Malcolm Pirnie, Inc.*, 949 F.2d 611 (2nd Cir. 1991), *cert. denied*, 506 U.S. 905, 113 S. Ct. 298, 121 L. Ed. 2d 222 (1992). Although Fahy is correct that he and other employees at BVI were subject to leave deductions for partial day absences, he misses the critical distinction between making deductions from *pay* for partial day absences and charging or making deductions from *leave time* for partial day absences. Having a policy of deducting from an employee's pay for partial day absences is inconsistent with being paid on a salary basis, *see Martin,* 949 F.2d 611, whereas having a policy of charging leave time is not. *See Cruz v. McAllister Bros.*, 52 F. Supp. 2d 269, 289-90 (D.P.R. 1999) (collecting cases); *Caperci v. Rite Aid Corp.,* 43 F. Supp. 2d 83, 91-93 (D. Mass. 1999); *Hood*, 23 F. Supp. 2d at 137 (holding that employer's method of payment which utilized employees' paid time off benefits to make up discrepancies between hourly pay and guaranteed minimum, was consistent with salary-basis

27

test); *Kuchinskas v. Broward County*, 840 F. Supp. 1548 (S.D. Fla. 1993) (holding that

employees whose accrued leave time had been reduced for absences of less than a day were paid

on a salaried basis within the meaning of 29 C.F.R. § 541.118, and noting that the Department of

Labor had taken the position that employers could reduce accrued leave for partial day absences

without jeopardizing the salaried status of employees), *aff'd*, 86 F.3d 1168 (11th Cir. 1996), *cert.*

*denied*, 519 U.S. 1148, 117 S. Ct. 1080, 137 L. Ed. 2d 215 (1997).

      The reduction of Fahy's sick time or his vacation time is consistent with the BVI

employee manuals which mention deductions of hours *generally*, not from pay or leave time

specifically.  (P-3 & 4).  The policies do not state in any way that an employee's pay will be

reduced.  One can infer, because the same manuals were used for all employees, that if an

employee was of the category of employee that received the benefit of sick and vacation time,

then the deductions for hours not worked would come from the leave time and not from actual

pay for the period.  Almost three years of time sheets demonstrate that this is the case in Fahy's

situation.  Having a written policy for making deductions allowed only for hourly employees, but

which applies to all employees both salaried and hourly, does not necessarily demonstrate that

those deductions will be made regardless of the circumstances and does not strip an otherwise

exempt employee of his exemption.  *Stanley v. City of Tracy*, 120 F.3d 179 (9th Cir. 1997).

BVI's policy of making deductions for partial day absences, although somewhat unclear, thus

does not preclude Fahy from being considered paid on a salary basis under FLSA regulations.[27]

---

[27] Additionally, Perkins's testimony that Fahy would not have been paid if he did not have leave available (*see* TR 145, 196) does not alter this court's conclusion, particularly under the evidence presented at trial.  For instance, on at least one occasion, Fahy was advanced leave by BVI.

### c.  Primary Duty as the Management of the Enterprise

To qualify for the executive exemption, Fahy's primary duty must have consisted of "the management of the enterprise in which employed or of a customarily recognized department thereof." 29 C.F.R. § 541.119.  "Primary duty" generally means the duty on which the employee spends the major part, or over fifty percent of his time. *See* 29 C.F.R. § 541.103.  Fahy's primary duty during the relevant period was the documentation of a computer system.  (TR 24). The time sheets indicate that he spent far more than fifty percent of his time on this duty.  (P-11). A "customarily recognized department of subdivision thereof" means "a unit with permanent status and function," not "a mere collection of men assigned from time to time to a specific job." 29 C.F.R. § 541.104.  The defendants merely contend that Fahy had managerial responsibility over certain projects; but the evidence reflects that Fahy's responsibilities did not remotely resemble "the management of the enterprise in which he is employed or of a customarily recognized department or subdivision thereof" as required under 29 C.F.R. § 541.119.[28]  To the contrary, Fahy's time sheets for the relevant period show that the vast portion of his work was on the Alabama Power contract.  The same records show that management of BVI was not even a noteworthy portion of his activities.  Instead, he was generating billable hours for BVI by doing various projects at Alabama Power.  The defendants have therefore failed to show that Fahy's primary duty consisted of managerial responsibilities.  Accordingly, the executive exemption claim fails during the relevant workweek periods herein.

---

[28] Perkins testified that Fahy had management responsibilities throughout his tenure with BVI. (TR 152).  He stated that Fahy could make hiring and termination recommendations.  (TR 155).  He does not provide details of whom Fahy supervised or when or the amount of time that Fahy spent performing management-type tasks.

### d. Directing the Work of Two or More Employees

Even if Fahy's primary duty had consisted of management-type activities, he would still fail to qualify for the executive exception because he did not direct the work of two or more employees during the relevant time period. "The employees must be employed in the department which the 'executive' is managing." 29 C.F.R. § 541.105(b). The defendants assert:

> Without question, and during the relevant time period, plaintiff supervised Kelvin Thomas. (R-247-253). Arguably, plaintiff also supervised Jim Vandiver. There was uncertainty by the witnesses as to the time period of the supervision. (R-189-191, 235-236). However, there were only two six month windows (February 1995-July 1995 and September 1997-December 1997) for which plaintiff worked at BVI which are not applicable to the time period plaintiff claims. However, plaintiff did supervise the workers at the Bell South [sic] contract site for which he had management responsibilities. (Defendant's exhibit 8, R-172, 220, 235). Also, plaintiff was involved with management of Amerex ((R-141) and Marketing for Laws on State project. (R-141, 156).

(Doc. 47, ¶ 12).

At trial, the defendants never demonstrated that Fahy managed a customarily recognized department as defined above or that he supervised other persons. The only evidence on point provided by the defense is that Fahy had some supervisory responsibility over Kelvin Thomas from the middle of 1995 until sometime in 1996. At best, only part of this time is within the relevant period. Thomas was not definitive about the time and manner of supervision by Fahy. (*See* TR 248-252). Additionally, the time sheets submitted by the defendants concerning Fahy's billing for activities at Protective Industrial Insurance Company ("PIICO") where Thomas worked, show that Fahy was billing for work there from February 1995 through August 20, 1995, about the time his status changed on the Alabama Power contract.[29] (D-11). Furthermore,

---

[29] Collins testified that although Fahy may have been working on other projects when he began the Alabama Power project, he did not continue to do so because he was "so bogged down" on that project. (TR 231).

it appears that Thomas was not even employed in Fahy's department as best the court can tell from the record evidence. The defendants' have offered no clear evidence that Fahy supervised other employees during the relevant time period.

The testimony cited by the defendants concerning Fahy's purported activities at BellSouth is unimpressive. Although Fahy may have supervised the BellSouth contracts before his status change, nothing in the record supports the defendants' contention that he was supervising those contracts during the relevant weeks. First, Perkins testified that when things picked up at Alabama Power, he was the one that was to "pick up the slack at BellSouth," not Fahy. (TR 172). Second, Collins testified that she could not remember the time line for Fahy's work. (TR 234). She was also "a little fuzzy" on Fahy's responsibility with the BellSouth workers. (TR 235). She did remember that while he was at Alabama Power, he did not supervise anyone there. (TR 234). Third, the time sheets for the relevant period do not support the defendants' contentions.

Similarly, the testimony concerning activities by Fahy at Amerex and with regard to Lawson State Community College is unclear. Perkins testified that Fahy worked some on these two projects. However, he did not provide any details or specific dates. In fact, at one point, he testified that he was "not sure" when Fahy worked with the Amerex people. (TR 141). He stated that it could have been after he took Collins's position and returned to BVI. (*Id.*). Similarly, with regard to Lawson State, Fahy may have been involved, but his activities were increased about the time Collins left. (TR 157). Once again, Fahy's time sheets do not support the defendants' claim that Fahy is exempt from the FLSA during the relevant period.

Based on the foregoing, the court finds that Fahy was paid on a "salary basis" for the

31

duration of his employment with BVI, including the time when he received extra compensation

for overtime hours worked, and that Fahy's salary exceeds the rate of pay requirement for the

highly salaried executive provision.  Fahy does not, however, fall within the "executive"

exemption because the defendants have not established that he meets the "duties requirement" of

the highly salaried executive.[30]

### 2. Administrative

The defendants also assert that Fahy is exempt from the FLSA under the *"bona fide*

*administrative"* provisions of the Act.  Generally, for an employee to fit within this exemption,

the employer must show that the employee performed the duties in sections (a) through (d) and

was paid on a salary basis per section (e), as is set forth below:

> The term *employee employed in a bona fide * * * administrative * * *
> capacity* in section 13(a)(1) of the Act shall mean any employee:
>
> (a) Whose primary duty consists of either:
>
> (1) The performance of office or nonmanual work directly related to management
> policies or general business operations of his employer or his employer's customers, or
>
> (2) The performance of functions in the administration of a school system, or
> educational establishment or institution, or of a department or subdivision thereof, in
> work directly related to the academic instruction or training carried on therein; and
>
> (b) Who customarily and regularly exercises discretion and independent
> judgment; and
>
> (c)(1) Who regularly and directly assists a proprietor, or an employee
> employed in a bona fide executive or administrative capacity (as such terms are
> defined in the regulations of this subpart), or
>
> (2) Who performs under only general supervision work along specialized or

---

30. Fahy also does not fall within the exemption under the stricter "long test" for the "bona fide executive" as
provided above.

technical lines requiring special training, experience, or knowledge, or

>    (3) Who executes under only general supervision special assignments and tasks; and

>    (d) Who does not devote more than 20 percent, or, in the case of an employee of a retail or service establishment who does not devote as much as 40 percent, of his hours worked in the workweek to activities which are not directly and closely related to the performance of the work described in paragraphs (a) through (c) of this section; and

>    (e)(1) Who is compensated for his services on a salary or fee basis at a rate of not less than $155 per week ($130 per week, if employed by other than the Federal Government in Puerto Rico, the Virgin Islands, or American Samoa), exclusive of board, lodging, or other facilities, or. . . .

29 C.F.R. § 541.2 (emphasis in original).

The applicable regulations contain a special provision for "high salaried administrative employees."  The provision includes within the definition "administrative" employees who are defined as follows:

>    . . . [A]n employee who is compensated on a salary or fee basis at a rate of not less than $250 per week exclusive of board, lodging, or other facilities, and whose primary duty consists of either the performance of office or nonmanual work directly relating to management policies or general business operations of the employer or the employer's customers... where the performance of such primary duty includes work requiring the exercise of discretion and independent judgment.  Such a highly paid employee having such work as his or her primary duty is deemed to meet all the requirements in § 541.2 (a) through (e). If an employee qualifies for exemption under this proviso, it is not necessary to test the employee's qualifications in detail under § 541.2 (a) through (e).

29 C.F.R. § 541.214.  This is almost identical to the provision discussed herein in § II.C.1.

The rate of pay and salary basis test for a "high salaried administrative employee" is the same as that of a "high salaried executive."  As the court determined in § II.C.1., Fahy meets these two requirements; therefore, only the duties requirements will be discussed in this section.

33

### a. Primary Duty - Office or Non-Manual Work

As the court noted above, Fahy's primary duty was documentation of a computer system during the relevant period. "If the work performed is 'office' work, it is immaterial whether the work is manual or nonmanual in nature." 29 C.F.R. § 541.203. Fahy's primary duty was performed using a computer in an office environment; therefore, Fahy's primary duty consisted of "office or nonmanual work."

### b. Directly Relating to Management Policies or General Business Operations of the Employer or the Employer's Customers

The defendants have not presented the necessary evidence to establish that Fahy's primary duty was directly related to the management policies or general business operations of BVI, Alabama Power, or any other business entity. Thus, he does not fit within the exemption.

### c. Exercise of Discretion and Independent Judgment

Under the applicable regulations, "the exercise of discretion and independent judgment involves the comparison and evaluation of possible courses of conduct and acting or making a decision after the various possibilities have been considered." 29 C.F.R. § 541.207. The term "implies that the person has the authority or power to make an independent choice, free from immediate direction or supervision and with respect to matters of significance." 29 C.F.R. § 541.207.

Under the "long test" for administrative employees, the employee must customarily and regularly exercise discretion and independent judgment. 29 C.F.R. § 541.2(b). Under the "short" test for "high salaried administrative employees," the employee's primary duty must only *include* work requiring the exercise of discretion and independent judgment. 29 C.F.R. §

34

541.214; *See O'Dell v. Alyeska Pipeline Service Co.*, 856 F.2d 1452 (9th Cir. 1988).

It is possible that Fahy could have exercised discretion and independent judgment in the computer documentation he performed while at Alabama Power.  In discussing discretion and independent judgment, the CODE OF FEDERAL REGULATIONS states that "[A] computer programmer would…be using discretion and independent judgment when he determines exactly what information must be used to prepare the necessary documents and by ascertaining the exact form in which the information is to be presented."  29 C.F.R. § 541.207(c)(7).  Although, this regulation discusses documentation by a programmer, the task is the same and it requires the same amount of discretion and independent judgment whether performed by someone whose primary duty is documentation or someone whose primary duty is programming.  The regulations, however, state that "preparation of instructions to the console operator who runs the computer" is a task that relies on skill rather than the use of discretion and independent judgment.

Fahy's primary duty may have included the requisite discretion and independent judgment, but from the evidence presented by the defendants, it is not possible to determine what level of discretion and independent judgment was needed or allowed.  Fahy might meet this aspect of the administrative exemption under the "short test" but he might not meet it under the "long test."  Nevertheless, this is not determinative because the defendants have failed to show that Fahy's primary duty was directly related to management policies or general business operations.  Because the employer has the burden of proving that the plaintiff falls within the exemption and because the exemption must be construed narrowly against the employer, the court finds that Fahy does not fall within this exemption either.

35

### 3. Professional

The defendants also assert that Fahy is exempt from the FLSA under the "*bona fide professional*" exemption.  Generally, for an employee to fall within this exemption, the employer must show that the employee performed the duties below in sections (a) through (d) and is paid on a salary basis per section (e).

The term *employee employed in a bona fide* * * * *professional capacity* in section 13(a)(1) of the act shall mean any employee:

(a) Whose primary duty consists of the performance of:

(1) Work requiring knowledge of an advance type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study, as distinguished from a general academic education and from an apprenticeship, and from training in the performance of routine mental, manual, or physical processes, or

(2) Work that is original and creative in character in a recognized field of artistic endeavor (as opposed to work which can be produced by a person endowed with general manual or intellectual ability and training), and the result of which depends primarily on the invention, imagination, or talent of the employee, or

(3) Teaching, tutoring, instructing, or lecturing in the activity of imparting knowledge and who is employed and engaged in this activity as a teacher in the school system or educational establishment or institution by which he is employed, or

(4) Work that requires theoretical and practical application of highly-specialized knowledge in computer systems analysis, programming, and software engineering, and who is employed and engaged in these activities as a computer systems analyst, computer programmer, software engineer, or other similarly skilled worker in the computer software field, as provided in § 541.303; and

(b) Whose work requires the consistent exercise of discretion and judgment in its performance; and

(c) Whose work is predominantly intellectual and varied in character (as opposed to routine mental, manual, mechanical, or physical work) and is of such character that the

output produced or the result accomplished cannot be standardized in relation to a given period of time; and

(d) Who does not devote more than 20 percent of his hours worked in the workweek to activities which are not an essential part of and necessarily incident to the work described in paragraphs (a) through (c) of this section; and

(e) Who is compensated for services on a salary or fee basis at a rate of not less than $170 per week ($150 per week, if employed by other than the Federal Government in Puerto Rico, the Virgin Islands, or American Samoa), exclusive of board, lodging, or other facilities: Provided, That this paragraph shall not apply in the case of an employee who is the holder of a valid license or certificate permitting the practice of law or medicine or any of their branches and who is actually engaged in the practice thereof, nor in the case of an employee who is the holder of the requisite academic degree for the general practice of medicine and is engaged in an internship or resident program pursuant to the practice of medicine or any of its branches, nor in the case of an employee employed and engaged as a teacher as provided in paragraph (a)(3) of this section: Provided further, That an employee who is compensated on a salary or fee basis at a rate of not less than $250 per week (or $200 per week, if employed by other than the Federal Government in Puerto Rico, the Virgin Islands, or American Samoa), exclusive of board, lodging, or other facilities, and whose primary duty consists of the performance either of work described in paragraph (a)(1), (3), or (4) of this section, which includes work requiring the consistent exercise of discretion and judgment, or of work requiring invention, imagination, or talent in a recognized field of artistic endeavor, shall be deemed to meet all of the requirements of this section: Provided further, That the salary or fee requirements of this paragraph shall not apply to an employee engaged in computer-related work within the scope of paragraph (a)(4) of this section and who is compensated on an hourly basis at a rate in excess of 6 ½ times the minimum wage provided by section 6 of the Act.

29 C.F.R. § 541.3.

As with the other exemptions, the CODE OF FEDERAL REGULATIONS contains a special

provision for "high salaried professionals." The provision is included within the definition of

"professional" employees:

Except as otherwise noted . . ., the definition of "professional" contains a special proviso for employees who are compensated on a salary or fee basis at a rate of at least $250 per week exclusive of board, lodging, or other facilities. Under this proviso, the requirements for exemption in § 541.3 (a) through (e) will be deemed to be met by an employee who receives the higher salary or fees and whose primary duty consists of the

37

performance of work requiring knowledge of an advanced type in a field of science or learning, or work as a teacher in the activity of imparting knowledge, which includes work requiring the consistent exercise of discretion and judgment, or consists of the performance of work requiring invention, imagination, or talent in a recognized field of artistic endeavor. Thus, the exemption will apply to highly paid employees employed either in one of the "learned" professions or in an "artistic" profession and doing primarily professional work. If an employee qualifies for exemption under this proviso, it is not necessary to test the employee's qualifications in detail under § 541.3 (a) through (e).

29 C.F.R. § 541.315.

Again, Fahy meets the salary and rate of pay requirement, thus only the duties

requirement of the exemption needs to be addressed.

### a. Primary duty consisting of the performance of work requiring knowledge of an advanced type in a field of science or learning

The defendants do not specify, nor is there any evidence of how, Fahy's primary duty

requires knowledge of an advanced type in a field of science or learning.

### b. Which includes work requiring the consistent exercise of discretion and judgment, or consists of the performance of work requiring invention, imagination, or talent in a recognized field of artistic endeavor

As discussed in the context of the administrative exemption, the defendants arguably did

not show that Fahy's primary duty included the exercise of discretion or judgment. The

"consistent exercise of discretion and judgment" is a higher standard than the standard of the

administrative exemption the court discussed in § II.C.2.c. which merely requires that the

employee's primary duty include work requiring the exercise of discretion and independent

judgment. Although the plaintiff's duties might meet the less rigorous administrative exemption

test, it would not meet the test here. Fahy's primary duty also has not been demonstrated to be

"artistic" as the defendant contends. Accordingly, the court finds that the defendants have not

38

established that Fahy meets this requirement. Therefore, Fahy is not exempt from the FLSA

under the standard professional employee exemption.

### 4. Computer Professional

The defendants also finally assert that Fahy is exempt from the FLSA under the computer

professional exemption. Employees who are paid on a salary or fee basis of at least $250 per

week may also be exempt from the FLSA as bona fide professional employees under 29 C.F.R. §

541.303 as computer professionals. 29 C.F.R. § 541.3(a)(4). However, the individual must have

"achieved a level of proficiency in the theoretical and practical application of a body of highly-

specialized knowledge in computer systems analysis, programming, and software engineering."

29 C.F.R. § 541.303. The regulation makes it clear that only employees who are highly-skilled

in computer systems analysis, programming, or related work in software functions are within the

exemption.[31] The defendants have not demonstrated that Fahy is such a highly skilled employee.

Thus, the court finds that Fahy is not within the exemption.

### 5. Summary

In sum, Fahy was not an exempt executive, administrative, or professional employee

_____

[31] The regulation provides:

> (c) The exemption provided by § 541.3(a)(4) applies only to highly-skilled employees who have achieved a level of proficiency in the theoretical and practical application of a body of highly-specialized knowledge in computer systems analysis, programming, and software engineering, and does not include trainees or employees in entry level positions learning to become proficient in such areas or to employees in these computer-related occupations who have not attained a level of skill and expertise which allows them to work independently and generally without close supervision. The level of expertise and skill required to qualify for this exemption is generally attained through combinations of education and experience in the field. While such employees commonly have a bachelor's or higher degree, no particular academic degree is required for this exemption, nor are there any requirements for licensure or certification, as is required for the exemption for the learned professions.

29 C.F.R. § 541.303.

during the relevant time period.  BVI did not pay Fahy overtime for weeks in which he worked

more than forty hours; therefore, Fahy is entitled to the recovery of overtime pay from BVI.[32]

### D. Liquidated Damages

The defendants assert that liquidated damages should not be awarded because any

violation of the FLSA was done in "good faith."  (Doc. 47).  This is an affirmative defense and

the defendants have the burden of proving it.  The FLSA provides, in relevant part:

> Any employer who violates the provisions of section 206 or section 207 of this title shall
> be liable to the employee or employees affected in the amount of their . . . unpaid
> overtime compensation . . . and in an additional equal amount as liquidated damages.

29 U.S.C. § 216(b).  The award of liquidated damages was mandatory until Congress amended the

FLSA in 1947 to confer judicial discretion in this determination.  The Portal to Portal Act ("Portal

Act") provides, in relevant part:

> In any action . . . to recover . . . unpaid overtime compensation, or liquidated
> damages, under the Fair Labor Standards Act of 1938 as amended [29 U.S.C. § 201
> *et seq.*], if the employer shows to the satisfaction of the court that the act or
> omission giving rise to such action was in good faith and that he had reasonable
> grounds for believing that his act or omission was not a violation of the [Act]. . . the
> court may, in its sound discretion, award no liquidated damages or award any
> amount thereof not to exceed the amount specified in section 216 of [the FLSA].

29 U.S.C. § 260.

Under the Portal Act, the employer must "bear the burden of proving that its violation was

'both in good faith and predicated upon such reasonable grounds that it would be unfair to impose

upon him more than a compensatory verdict.'" *Joiner v. City of Macon*, 814 F.2d 1537, 1539 (11[th]

---

[32] The defendants also complain that Fahy took "advantage of BVI" and that it is "unfair for plaintiff to profit from a
situation created by his doing."  (Doc. 49, ¶ 2).  What the defendants fail to comprehend is that they were also billing Alabama
Power for all of the hours he worked on that contract, making a significant profit and building rapport for future business.  The
defendants' liability herein is a consequence of their taking advantage of Fahy's changed status without meeting the
requirements of the FLSA for a non-exempt employee.

Cir. 1987); 29 U.S.C. § 260.

Because the court has determined that the defendants acted willfully, warranting the imposition of liquidated damages, demonstrating good faith was the defendants' responsibility. Neither the record nor the defendants' post-trial arguments support a finding of good faith on their part. On the contrary, reviewing the record in its entirety, there is no evidence of good faith. Perkins, by his admission, was an experienced businessman; the FLSA overtime requirements are not of recent vintage; Perkins undertook no investigation or inquiry in this matter despite questions from BVI's accountant regarding Fahy's status and pay changes. Due to the defendants' failure to support a "good faith" defense under the circumstances in this case, the court must conclude that the defendants' violation of the FLSA was not in "good faith."[33]

### E. Personal Liability of James Perkins

Fahy contends that Perkins, along with BVI, is an employer under the FLSA and is jointly and severally liable for damages. Perkins asserts that he is not an employer under the FLSA because he did not have operational or day-to-day control at BVI during the relevant time period.

The FLSA defines an "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee . . . ." 29 U.S.C. § 203(d). "The overwhelming weight of authority is that a corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation, jointly and severally liable under the FLSA for unpaid wages." *Patel v. Wargo*, 803 F.2d 632, 637-38 (11th Cir. 1986), *citing Donovan v. Agnew*, 712 F.2d 1509, 1511 (1st Cir. 1983). "The Supreme Court has termed the Act's employer definition

---

[33] If anything, a fair reading of the record demonstrates that Perkins's decision to only pay Fahy regular pay for his "overtime" hours was motivated by BVI's obvious need to be profitable. If Fahy had been paid as required by the FLSA, the profit margin on the Alabama Power contract would have been reduced significantly.

41

"expansive" and has held that "managerial responsibilities" and "substantial control of the terms

and conditions of the [employees'] work" create statutory employer status. *Donovan v. Grim Hotel*

*Co.*, 747 F.2d 966, 971-72 (5th Cir. 1984), *cert. denied*, 471 U.S. 1124, 105 S. Ct. 2654, 86 L. Ed.

2d 272 (1985), *citing Falk v. Brennan*, 414 U.S. 190, 195, 94 S. Ct. 427, 431, 38 L. Ed. 2d 406

(1973). *See also Herman v. RSR Security Services Ltd.*, 172 F.3d 132, 139 (2nd Cir. 1999) ("The

Supreme Court has emphasized the "expansiveness" of the FLSA's definition of employer."). In

determining whether an individual is an employer under FLSA, the Fifth Circuit has stated:

> Our determination of Alberding's status is not circumscribed by formalistic
> labels or common-law notions of the employment relationship, *Bartels v.*
> *Birmingham*, 332 U.S. 126, 67 S. Ct. 1547, 91 L. Ed. 1947 (1947); *Mednick v.*
> *Albert Enterprises, Inc.*, 508 F.2d 297 (5th Cir. 1975). Instead, our analysis must
> focus upon the totality of the circumstances, underscoring the economic realities of
> the irrigation workers' employment. *Real v. Driscoll Strawberry Associates, Inc.*,
> 603 F.2d 748 (1978); *Hodgson v. Griffin and Brand of McAllen, Inc. See*
> *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 67 S. Ct. 1473, 91 L. Ed. 1772
> (1947). In so doing, we adhere to the firmly-established guidon that the FLSA must
> be liberally construed to effectuate Congress' remedial intent. *Donovan v.*
> *Janitorial Services, Inc.*, 672 F.2d 528 (5th Cir. 1982); *Donovan v. I-20 Motels, Inc.*,
> 664 F.2d 957 (5th Cir. 1981).
>
> . . . .
>
> Contrary to appellant's suggestion, neither the Act nor jurisprudence
> designates stock ownership in a corporate employer as the *sine qua non* of employer
> status where other forms of control of the employment relationship have been
> proven. No one factor is dispositive; rather, it is incumbent upon the courts to
> transcend traditional concepts of the employer-employee relationship and assess the
> economic realities presented by the facts of each case. *See Goldberg v. Whitaker*
> *House Cooperative*, 366 U.S. 28, 81 S. Ct. 933, 6 L. Ed. 2d 100 (1961).

*Donovan v. Sabine Irrigation Co.*, 695 F.2d 190, 194-95 (5th Cir.), *cert. denied*, 463 U.S. 1207, 103

S. Ct. 3537, 77 L. Ed 2d 1387 (1983), *abrogation on other grounds recognized by Reich v. Bay,*

*Inc.*, 23 F.3d 110 (5th Cir. 1994). *Accord RSR Security Services Ltd.*, 172 F.3d at 139 (setting forth

considerations under the "economic realities test").

Generally, a corporation and its shareholders are deemed separate. *See Homan and Crimen, Inc. v. Harris*, 626 F.2d 1201, 1208 (5th Cir. 1980), *cert. denied*, 450 U.S. 975, 101 S. Ct. 1506, 67 L. Ed. 2d 809 (1981); *Krivo Industrial Supply Co. v. National Distillers and Chemical Corp.*, 483 F.2d 1098, 1102 (5th Cir. 1973). It is also well-settled that pricing the corporate veil is "not lightly" done. *Homan*, 626 F.2d at 1208.

> "[W]hen the person who owns or controls the corporation has abused this privilege, however, by using the corporate form to defeat justice, perpetuate fraud, promote crime, evade contractual or tort responsibility, or for any other reason which in equity or good conscience would justify the disregard of the corporate entity, the court may pierce the corporate veil in order to correct the abuse."

*United States v. Fidelity Capital Corp.*, 920 F.2d 827, 836-37 (11th Cir. 1991). "The mere fact that a person owns and controls a corporation will not justify a finding of abuse of the corporate entity, even though that person may have used the corporation to promote his own ends." *Id.*

Perkins was the President and sole shareholder of BVI. He had exclusive control over all aspects of Fahy's compensation agreement. He negotiated and signed Fahy's employment contract. He evaluated whether to pay Fahy additional compensation for working extra hours on the Alabama Power contract. He signed off on the pay change. Perkins was the only person in the company that could authorize extra pay for Fahy. He also authorized a raise in salary for Fahy while Fahy was working on the Alabama Power contract in May1996. He is also the one who discussed the pay issue with Collins and the BVI accountant.

The record reveals that, during some of the pertinent time, Perkins was running his election campaign for Mayor of Selma. As best the court can determine this was from about

August 1995 until August 1996. He claims that he was not involved in the operations of the

company during that time. The evidence refutes this. For instance, he still managed to approve

Fahy' wage and job changes. Perkins's claim that he was an absent owner during the violations

is without merit. By his own account, he was sufficiently, and one could even conclude

actively,[34] involved in the day-to-day operations of the business after August 1995, during the

entire period of the violation for which BVI is responsible. Perkins had substantial control over

the operations of the business to warrant liability as an employer under the FLSA.[35]

## III. DAMAGES

Having determined that the defendants are liable under the FLSA for overtime wages, the

court must now determine the appropriate damages. As is discussed above, because of the

procedural aspects of this case, the present FLSA action against BVI must be deemed

commenced on October 19, 1998, the date Fahy's authorization to proceed was filed. The

FLSA action against Perkins was commenced November 4, 1998, the date the amended

complaint was filed.

After examining the relevant exhibits submitted at the trial, particularly the time sheets in

plaintiff's exhibit 11 and defendants' exhibit 12 and the summary chart in plaintiff's exhibit

---

[34] In Perkins's October 1995 memorandum to the accountant, he stated that he was going to pick up the slack at BellSouth that might result from Fahy's change in duties. (D-8).

[35] In reaching this determination, the court has not ignored the testimony that Perkins had division leaders, an administrative assistant, Shirley Feagin, and the fact that many management decisions and day-to-day operations were handled by staff. (TR 207-08). Perkins stated that after he lost the election in 1996, he was again actively involved in the business, although much of his time was spent "disassembling it more than building it because it was in pretty bad shape." (TR 208).

12,[36] the court finds the uncompensated overtime hours and amounts due as follows:

### 1995

| WEEK ENDING | OVERTIME HOURS |
|---|---|
| 10/22/95 | 0.0[37] |
| 10/29/95 | 0.0[38] |
| 11/05/95 | 12.5 |
| 11/12/95 | 0.9[39] |
| 11/19/95 | 5.2 |
| 11/26/95 | 0.0[40] |
| 12/03/95 | 29.8 |
| 12/10/95 | 26.6[41] |
| 12/17/95 | 28.9 |
| 12/24/95 | 7.1 |
| 12/31/95 | 0.0[42] |
| | |
| 1995 TOTAL  HOURS | 111 |

| | |
|---|---|
| UNPAID OVERTIME RATE | $11.54 |
| (ONE-HALF HOURLY RATE OF $23.08) | |

---

[36] Fahy submitted a revised exhibit 12 (along with his post-trial brief (doc. 48, exhibit A)), which notes many of corrections delineated by the court herein.

[37] Despite the plaintiff's assertion that the amount of unpaid overtime hours for this week is "2.0," the court finds that the number of overtime hours is "0.0" because the plaintiff used 32 hours of sick leave this week. *See Joseph G. Moretti, Inc. v. Boogers*, 376 F.2d 27 (5th Cir. 1967) (holding that overtime for holidays, Saturdays, and Sundays is due only for that time in any particular week in which the employee actually worked more than forty hours); *Cf* 29 C.F.R. §§778.216 & 218 (vacation time, holiday time, sick time, and other periods where the employer did not provide sufficient work, or "other similar cause[s]" may not be credited toward overtime compensation due under the FLSA). Thus, Fahy did not work 40 hours for purposes of the FLSA.

[38] The plaintiff used 10.7 hours of sick leave this week, reducing his "workweek" to less than 40 hours.

[39] The plaintiff used eight hours of holiday leave, reducing his overtime to "0.9" hours under the FLSA.

[40] The plaintiff used 16 hours of holiday leave, reducing his overtime to "0.0."

[41] Although there are no deductions for sick leave, etc., the time sheet overtime addition is incorrect. (P-11, December 10, 1995).

[42] The plaintiff used 16 hours of holiday leave, reducing his overtime to "0.0."

1995 UNPAID OVERTIME                $1,280.94[43]

## 1996

| WEEK ENDING | OVERTIME HOURS |
|---|---|
| 01/07/96 | 4.1[44] |
| 01/14/96 | 24.9 |
| 01/21/96 | 20.8 |
| 01/28/96 | 26.7 |
| 02/04/96 | 0.7[45] |
| 02/11/96 | 10.4[46] |
| 02/18/96 | 31.0[47] |
| 02/25/96 | 34.6[48] |
| 03/03/96 | 28.8 |
| 03/10/96 | 33.9[49] |
| 03/17/96 | 45.0 |
| 03/24/96 | 25.7 |
| 03/31/96 | 32.9 |
| 04/07/96 | 29.0 |
| 04/14/96 | 24.4 |
| 04/21/96 | 20.4 |
| 04/28/96 | 23.9 |
| 04/30/96 | 7.9 |
| 05/05/96 | 27.1 |
| 05/12/96 | 16.5 |
| 05/19/96 | 15.9 |
| 05/26/96 | 27.3 |

---

[43] Although the calculation of damages for each defendant commenced on different days because of the statute of limitations issues discussed previously, the ultimate amounts due are the same because the amount of overtime is for the week ending November 5, 1995, within the statute of limitations for both defendants.

[44] The plaintiff used eight hours of holiday leave this week, reducing his overtime to "4.1" hours.

[45] The plaintiff only listed 32 hours of regular time on his time sheet, reducing the overtime to "0.7" hours.

[46] The plaintiff used 5.1 hours of sick leave, reducing his overtime to "10.4" hours.

[47] The plaintiff used 1.4 hours of sick leave, reducing his overtime to "31.0" hours.

[48] The plaintiff used 1.3 hours of sick leave (doctor), reducing his overtime to "34.6" hours.

[49] The plaintiff used .6 hours of sick leave (doctor), reducing his overtime to "33.9" hours.

| | |
|---|---|
| 06/02/96 | 6.0[50] |
| 06/09/96 | 11.4[51] |
| 06/16/96 | 23.0 |
| 06/23/96 | 41.0 |
| 06/30/96 | 7.5 |
| 07/07/00 | 0.0 |
| 07/14/96 | 27.6 |
| 07/21/96 | 27.9 |
| 07/28/96 | 24.3 |
| 08/04/96 | 16.1 |
| 08/11/96 | 22.0 |
| 08/18/96 | 11.0 |
| 08/25/96 | 21.9 |
| 09/01/96 | 5.5 |
| 09/08/96 | 2.4[52] |
| 09/15/96 | 14.2 |
| 09/22/96 | 2.5 |
| 09/29/96 | 7.2[53] |
| 10/06/96 | 22.2 |
| 10/13/96 | 17.7 |
| 10/20/96 | 22.0 |
| 10/27/96 | 28.0 |
| 11/03/96 | 15.6[54] |
| 11/10/96 | 17.7 |
| 11/17/96 | 21.1[55] |
| 11/24/96 | 35.7 |
| 12/01/96 | 0.0[56] |

[50] The plaintiff used eight hours of holiday leave, reducing his overtime to "6" hours.

[51] The plaintiff used eight hours of sick leave, reducing his overtime to "11.4" hours.

[52] The plaintiff used eight hours of holiday leave and 4.6 hours of sick leave (doctor), reducing his overtime to "2.4" hours.

[53] The plaintiff used seven hours of vacation leave, reducing his overtime to 7.2 hours.

[54] This includes the time sheet for 10/31/1996, which is a partial time sheet report.

[55] The plaintiff used eight hours of holiday leave, reducing his overtime to "21.1" hours.

[56] The plaintiff used 16 hours of leave, reducing his overtime from "12.6" hours to "0.0" hours.

47

| | |
|---|---|
| 12/08/96 | 29.2 |
| 12/15/96 | 17.3 |
| 12/22/96 | 7.7 |
| 12/29/96 | 0.0 |
| | |
| 1996 TOTAL HOURS - 05/05/1996 | 452.2 |
| - 12/31/1996 | 565.4 |
| | |
| UNPAID OVERTIME RATE THROUGH 05/05/96 | $11.54[57] |
| SUBTOTAL | $5,218.39 |
| UNPAID OVERTIME RATE THROUGH END OF YEAR | $12.23 |
| SUBTOTAL | $6,914.84 |
| 1996 TOTAL UNPAID OVERTIME | $12,133.23 |

**1997**

| WEEK ENDING | OVERTIME HOURS |
|---|---|
| 01/05/97 | 0.0 |
| 01/12/97 | 0.0 |
| 01/19/97 | 0.1 |
| 01/26/97 | 11.7 |
| 02/02/97 | 5.5 |
| 02/09/97 | 7.4 |
| 02/16/97 | 11.3 |
| 02/23/97 | 10.2 |
| 03/02/97 | 6.5 |
| 03/09/97 | 12.0 |
| 03/16/97 | 5.1[58] |
| 03/23/97 | 2.1[59] |

---

[57] It was necessary to divide the year because Fahy received a raise in May.

[58] The plaintiff used eight hours of vacation leave, reducing his overtime to "5.1" hours.

[59] The plaintiff used eight hours of vacation leave, reducing his overtime to "2.1" hours.

48

| | |
|---|---|
| 03/30/97 | 14.7 |
| 04/06/97 | 22.6 |
| 04/13/97 | 30.8 |
| 04/21/97 | 35.4 |
| 04/27/97 | 42.9[60] |
| 05/04/97 | 39.5[61] |
| 05/11/97 | 34.6 |
| 05/18/97 | 16.1 |
| 05/25/97 | 19.5 |
| 06/01/97 | 19.5[62] |
| 06/08/97 | 8.2[63] |
| 06/15/97 | 29.3 |
| 06/22/97 | 30.4 |
| 06/29/97 | 4.0[64] |
| 07/06/97 | 0.9[65] |
| 07/13/97 | 7.3[66] |
| 07/20/97 | 13.4 |
| 07/27/97 | 12.5[67] |
| 08/03/97 | 3.2[68] |
| 08/10/97 | 0.0 |
| 08/17/97 | 12.1 |

---

[60] The modified exhibit submitted by the plaintiff lists the overtime as 39.5 hours; however, the court has reviewed the pertinent exhibit from trial (the 4/27/1997 time sheets) and finds that 42.9 is the correct number.

[61] The plaintiff used 1.9 hours of sick leave (doctor), reducing his overtime to "39.5" hours. The plaintiff apparently did not deduct this time from the overtime hours.

[62] The plaintiff used eight hours of holiday leave, reducing his overtime to "19.5" hours.

[63] The plaintiff only listed 32 regular hours on his time sheet and 16.2 hours of overtime. Accordingly, the overtime has been recalculated to be "8.2" hours.

[64] The plaintiff used 16 hours of vacation leave, reducing his overtime to "4" hours.

[65] The plaintiff only listed 38.8 regular hours on his time sheet and he used eight hours of holiday leave, reducing his overtime to "0.9" hours.

[66] The plaintiff only worked 39.3 regular hours according to his time sheet and he used seven hours of sick leave, reducing his overtime to "7.3" hours.

[67] The plaintiff used 3.1 hours sick leave (doctor), reducing his overtime to "12.5" hours.

[68] The plaintiff only worked 32 regular hours according to his time sheet, reducing his overtime to "3.2" hours.

| | |
|---|---|
| 08/24/97 | 12.7 |
| 08/31/97 | 0.0[69] |
| 1997 HOURS TOTAL | 481.5 |
| UNPAID OVERTIME RATE | $12.23 |
| 1997 UNPAID OVERTIME | $5,888.75 |

## TOTAL

| | |
|---|---|
| TOTAL OVERTIME DUE FOR ALL THREE YEARS | $19,302.92 [70] |

Because the court further finds the defendants' conduct to be willful, the amount of damages is doubled, totaling $38,605.84. *Joiner*, 814 F.2d at 1539 (absent an explicit finding that the employer acted in good faith, the court must impose the full amount of liquidated damages); *Willis v. City of Florence, Ala.*, 1988 WL 188461, *4 (N.D. Ala. 1988), *aff'd*, 891 F.2d 906 (table) (11th Cir. 1989) (same).

## IV. CONCLUSION

Premised on the foregoing, the plaintiff is entitled to a judgment against the defendants in the amount stated above. The court further finds that the defendants' motion for judgment as a matter of law (doc. 45) is due to be denied. An appropriate judgment will be entered.

---

[69] The plaintiff used 24 hours of vacation leave and 1.2 hours of sick leave (doctor), reducing his overtime to "0.0" hours.

[70] In reaching this amount, the court has considered the various positions of the defendants, including, but not limited to, arguments that (1) Fahy is entitled to overtime for the hours worked only on the Alabama Power contract; (2) Perkins's liability is limited to post-July 14, 1997 (two years before he was actually served); and, the defendants are due a set-off for work already paid. (Doc. 49, ¶¶ 17-20). The defendants do not cite any authority for these positions and the court is not persuaded by the same. First, the FLSA is not limited by the projects the defendants believe that it applies. Second, as already noted, the service date is not the date for commencement of this action as to Perkins. Third, the record does not support the defendants' contention that they have already paid Fahy in the amounts required by the FLSA under the circumstances.

**DONE,** this the __21st__ day of November, 2000.

_____

**JOHN E. OTT**
United States Magistrate Judge